## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **SHARDE HARVEY, D.D.S., PLLC** | **SECOND AMENDED COMPLAINT** |
| **Plaintiff,** | **JURY TRIAL DEMANDED** |
| **vs.** | **NO:  1:20-cv-03350** |
| **SENTINEL INSURANCE COMPANY LTD** | |
| **Defendant.** | |

Plaintiff Sharde Harvey D.D.S., PLLC ("Plaintiff" or "Harvey") brings this Second Amended Complaint, alleging relief against Defendant Sentinel Insurance Company Ltd. ("Sentinel") and avers as follows:

### I.    NATURE OF THE CASE

1.    This is a civil action seeking declaratory relief arising from Plaintiff's contract of insurance with Defendant.

2.    Plaintiff is a dental practice located in New York.

3.    In light of the Coronavirus global pandemic and state and local orders mandating that all non-essential in-store businesses must shut down, and the suffering of physical harm and impact and damages occurring both within Plaintiff's dental practice and/or within the immediate area surrounding and outside its dental practice, Plaintiff was forced to significantly reduce the operations of its dental practice, including suspending all non-emergency dental care prior to the occurrence of the Coronavirus global pandemic. Because of the shutdown, Plaintiff only performed emergency services for patients as opposed to preventive dental care as needed, but not more than once a week or once every two weeks.

1

4.      Plaintiff's dental practice derives most of its revenue from preventative dental treatments. Plaintiff lost revenue and was closed as a result of the Governor of New York's Civil Authority Orders.

5.      Plaintiff's insurance policy provides coverage for all non-excluded business losses and thus provides coverage here.

6.      As a result, Plaintiff is entitled to declaratory relief that its business is covered for all business losses that have been suffered and sustained, which losses are in an amount greater than $150,000.00.

## II.      JURISDICTION

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship between Plaintiff and the Defendants. Plaintiff is a citizen of New York. Defendant is a citizen of Connecticut. The value of Plaintiff's claims exceeds $150,000.00.

8.      This Court has personal jurisdiction over Defendant. At all relevant times Defendant has engaged in substantial business activities in the State of New York. At all relevant times Defendant transacted, solicited, and conducted business in New York through its employees, agents, and/or sales representatives, and derived substantial revenue from such business in New York. Plaintiff's policy with Defendant was for Plaintiff's dental practice in New York.

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because Plaintiff's principal place of business is located in this District and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, including the formation of the Policy underlying Plaintiff's claims. The Policy was intended to cover Plaintiff's practice in this District.

## III.      PARTIES

2

10.     Plaintiff Harvey is a New York professional limited liability company. At all relevant times, Plaintiff Harvey is authorized to do business in the State of New York. Harvey owns, operates, manages, and/or controls a dentist office located at 121 E. 60th Street, Apartment 1B, New York, New York 10022 ("Insured Property"). Plaintiff Harvey is owned by Sharde Harvey, a citizen and resident of New York.

11.     Defendant Sentinel underwrote the insurance provided to Plaintiff and is headquartered at 1 Hartford Plaza, Hartford, Connecticut 06155. Sentinel is a citizen of Connecticut.

12.     At all relevant times, Defendant issued a policy to Harvey to cover business interruption loss from December 16, 2019 until December 16, 2020. The policy number is 10 SBA VP 9803. This policy was intended to cover losses to business interruption. *See* Policy Declaration, attached hereto as Exhibit 1 and referred to hereinafter as the "Policy."

13.     The Policy for Plaintiff is currently in full effect, and it includes coverage for, among other things, business personal property, business income, special business income, professional business income, extra expenses, interruption by civil authority or military authority, service interruption, and tenant emergency evacuation due to order by civil authority.

14.     Plaintiff submitted a claim for a business loss pursuant to its Policy, seeking coverage under the Policy. Defendant issued a reservation of rights letter to Plaintiff, wherein, Defendant identified many provisions of the Policy that it purportedly will rely on for determining that coverage for the types of claims that Plaintiff was making would not be covered. Essentially, Defendant's reservation of rights letter implied that there would be a rejection of Plaintiff's business loss and business interruption claims and other claims, contending, *inter alia*, that

Plaintiff did not suffer physical damage to its property directly and stating other reasons why Plaintiff is not purportedly entitled to coverage for the losses and damages claimed.

15.     The rejection of Plaintiff's losses and claim by Defendant was wrong and violated the terms of the Policy and governing case law for the interpretation of the Policy. More specifically, but without limitation, the rejection of Plaintiff's claim on the basis that Plaintiff allegedly did not suffer physical damage to the properties and in reliance on the Virus Exclusion provision of the Policy are invalid reasons to have denied the claim. Defendant's denials are in violation of the provisions of and proper and fair interpretation of the Policy. The Virus Exclusion does not exclude coverage for losses associated with this pandemic, and Plaintiff has suffered physical damage or loss.

## IV.     FACTUAL BACKGROUND

### A.  Insurance Coverage

16.     Defendant entered into a contract of insurance with Plaintiff, whereby payments were made to Defendant in exchange for Defendant's promise to indemnify Plaintiff for losses, including but not limited to business income losses at Plaintiff's Insured Property.

17.     Plaintiff's Insured Property is covered under the Policy issued by Defendant. *See* Ex. 1.

18.     The Policy provides, among other things property, business personal property, business income and extra expense, contamination coverage, and additional coverages.

19.     Plaintiff faithfully paid Policy premiums to Defendant, specifically to provide, among other things, additional coverages in the event of business interruption or closures for a variety of reasons, including by order of Civil Authority.

20.     Under the Policy, business interruption insurance coverage is extended to apply to, *inter alia*, the actual loss of business income sustained, and the actual, necessary and reasonable extra expenses incurred.

21.     The Policy is an all-risk Policy, insofar as it provides that covered causes of loss under the Policy means direct loss or damage unless the loss is specifically excluded or limited in the Policy.

22.     An all-risk Policy such as that purchased by Plaintiff is one that protects against catastrophic events, such as the one occurring now, involving the global COVID-19 Pandemic that has resulted in the widespread, omnipresent and persistent presence of COVID-19 in and around Plaintiff's Insured Property, including adjacent properties. Coverage under an all-risk Policy is to be broadly interpreted and provided.

23.     Plaintiff's all-risk Policy includes coverage for business interruption, which is standard in most all-risk commercial property insurance policies, along with coverage for extended expenses.

24.     Plaintiff purchased the Policy expecting to be insured against losses, including, but not limited to, business income losses at the Insured Properties.

25.     Plaintiff purchased, among other coverages, business interruption coverage for closure by Order of Civil Authority.

26.     Based upon information and belief, the Policy provided by Defendant included language that is essentially standardized language adopted from and/or developed by the ISO ("Insurance Service Office"). The ISO, founded in 1971, provides a broad range of services to the property and casualty insurance industry. In addition to form policies, ISO collects and manages databases containing large amounts of statistical, actuarial, underwriting, and claims information,

fraud-identification tools, and other technical services. ISO describes itself as follows: "ISO provides advisory services and information to many insurance companies. … ISO develops and publishes policy language that many insurance companies use as the basis for their products." ISO General Questions, Verisk, https://www.verisk.com/insurance/about/faq/ (last visited June 5, 2020); *see also* Insurance Services Office (ISO), Verisk, https://www.verisk.com/insurance/brands/iso/ (last visited June 5, 2020).

27.    The language in the Policy is language that is "adhesionary" in that Plaintiff was not a participant in negotiating or drafting its content and provisions.

28.    Plaintiff possessed no leverage or bargaining power to alter or negotiate the terms of the Policy, and more particularly, Plaintiff had no ability to alter, change or modify standardized language derived from the ISO format.

29.    Upon information and belief, the "Virus Exclusion" in the Policy was never intended by the ISO nor Defendant to pertain to a situation like the present global Pandemic of the Coronavirus and therefore does not apply to exclude coverage in this matter.

30.    Upon information and belief, the Virus Exclusion in the Policy was developed by the ISO in response to the SARS situation that occurred in or around 2005-2006, which was not a Pandemic and not a global Pandemic as is the present COVID-19 Pandemic situation, and therefore was never intended to exclude coverage for a circumstance as presented in this matter.

31.    Further, to the extent the Virus Exclusion was permitted by state insurance commissioners or departments, the Virus Exclusion was first permitted due to misleading and fraudulent statements by the ISO that property insurance policies do not and were not intended to cover losses caused by viruses, and so the Virus Exclusion offers mere clarification of existing law. To the contrary, before the ISO made such baseless assertions, courts considered

contamination by a virus to be physical damage. Defendant's use of the Virus Exclusion to deny coverage here shows that the Virus Exclusion was fraudulently adopted, adhesionary, and unconscionable and as an attempt to expand the limitations of coverage without proper disclosures. *See* https://www.propertycasualty360.com/2020/04/07/here-we-go-again-virus-exclusion-for-covid-19-and-insurers/ (last visited June 12, 2020).

32.     Regulatory estoppel applies and Defendant should not be permitted to rely on the Virus Exclusion because of its conduct and any associated conduct of the ISO to inappropriately obtain the permission of state insurance commissioners or departments to include the language of the Virus Exclusion in its policies.

33.     The Virus Exclusion applies only to "loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease."

34.     Plaintiff purchased the Policy with an expectation that it was purchasing a Policy that would provide coverage in the event of business interruption and extended expenses, such as that suffered by Plaintiff as a result of COVID-19.

35.     At no time had Defendant, or its agents, notified Plaintiff that the coverage that Plaintiff had purchased pursuant to an all-risk Policy that included business interruption coverage, had exclusions and provisions that purportedly undermined the very purpose of the coverage, of providing benefits in the occurrence of business interruption and incurring extended expenses.

36.     The purported exclusions of the Policy that Defendant has or is expected to raise in defense of Plaintiff's claim under the Civil Authority coverage of the Policy are contradictory to the provision of Civil Authority Order coverage and violates the public policy of New York and other states as a contract of adhesion and hence is not enforceable against Plaintiff.

37.     Access to Plaintiff's business was severely limited and/or prohibited by Civil Authority Orders which precluded Plaintiff from operating their Insured Property in the manner intended, for which such insurance was purchased. For example, Plaintiff was only allowed to perform emergency care but was closed to the general public for general dental cleanings and other dental maintenance. The Policy provides for coverage for actual loss of business sustained and actual expenses incurred as a covered loss caused by the prohibitions of the Civil Authority Orders in the area of Plaintiff's Insured Property, which applies to circumstances presented by Plaintiff.

38.     The reasonable expectations of Plaintiff, *i.e.*, an objectively reasonable interpretation by the average Policyholder of the coverage that was being provided, was that the business interruption coverage included coverage when a civil authority forced closure of the business for an issue of public safety such as that involving the COVID-19 pandemic in the immediate area surrounding the Insured Properties.

39.     The Policy does not exclude the losses suffered by Plaintiff and therefore, the Policy does provide coverage for the losses incurred by Plaintiff.

40.     Plaintiff suffered direct loss or damage within the definitions of the Policy as loss of use of property as it was intended to be used, as here, constitutes loss or damage.

41.      The virus and bacterium exclusions do not apply because Plaintiff's losses were not solely caused by a virus, bacterium or other microorganism. Instead, Plaintiff's losses were also caused by the entry of Civil Authority Orders, particularly those by the Governors of New York and by the States' Departments of Health, to mitigate the spread of COVID-19. The Civil Authority Orders were issued because of damage to individuals and property caused by COVID-

8

19. The Civil Authority Orders were more than mere social distancing enactments but required closure.

42.    The Civil Authority Orders prohibited access to Plaintiff's Insured Property. Plaintiff's facility was denied access to the general public and was unable to operate its dental office at full capacity due to the Civil Authority stay-at-home orders issued by the Governor of New York. The Civil Authority Orders were entered in response to dangerous physical conditions described above resulting from COVID-19.

43.    As a result of the presence of COVID-19 and the Civil Authority Orders, Plaintiff lost Business Income and incurred Extra Expense.

44.    Based on information and belief, Defendant has accepted the Policy premiums with no intention of providing any coverage for business losses or the Civil Authority extension due to a loss and shutdown from a pandemic. Plaintiff made a claim under the Policy, and upon information and belief, Defendant has no intention of paying the claim. Plaintiff submitted a claim for a business loss pursuant to its Policy, seeking coverage under the Policy. Defendant issued a reservation of rights letter to Plaintiff, wherein, Defendant identified many provisions of the Policy that it purportedly will rely on for determining that coverage for the types of claims that Plaintiff was making would not be covered. Essentially, Defendant's reservation of rights letter implied that there would be a rejection of Plaintiff's business loss and business interruption claims and other claims, contending, *inter alia*, that Plaintiff did not suffer physical damage to its property directly and stating other reasons why Plaintiff is not purportedly entitled to coverage for the losses and damages claimed.

## B.  The Coronavirus Pandemic

45.    The scientific community, and those personally affected by the virus, recognize COVID-19 as a cause of real physical loss and damage. It is clear that contamination of the Insured

Property is a direct physical loss requiring remediation to clean the surfaces of the Insured Property.

46.     The virus that causes COVID-19 remains stable and transmittable in aerosols for up to three hours, up to four hours on copper, up to 24 hours on cardboard and up to two to three days on plastic and stainless steel. *See* https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces (last visited April 9, 2020).

47.     The CDC has issued a guidance that gatherings of more than 10 people must not occur. People in congregate environments, which are places where people live, eat, and sleep in close proximity, face increased danger of contracting COVID-19.

48.     On March 11, 2020, the World Health Organization ("WHO") made the assessment that COVID-19 shall be characterized as a pandemic. *See* https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

49.     The global Coronavirus pandemic is exacerbated by the fact that the deadly virus physically infects and stays on surfaces of objects or materials where it can "fomite." Human coronaviruses can remain infectious on inanimate surfaces at room temperature for up to 9 days. At a temperature of 30 degrees Celsius (86 degrees F) or more the duration of persistence is shorter. *See* https://www.ncbi.nim.nih.gov/pmc/articles/PMC7132493/ (last visited July 16, 2020).

50.     A particular challenge with the novel coronavirus is that it is possible for a person to be infected with COVID-19 but be asymptomatic. Thus, seemingly healthy people unknowingly spread the virus via speaking, breathing, and touching objects.

51.     While infected droplets and particles carrying COVID-19 may not be visible to the naked eye, they are physical objects which travel to other objects and cause harm. Habitable

surfaces on which COVID-19 has been shown to survive include, but are not limited to, stainless steel, plastic, wood, paper, glass, ceramic, cardboard, and cloth.

52.     The virus is thought to spread mainly from person-to-person: between people who are in close contact with one another (within about 6 feet); through respiratory droplets produced when an infected person coughs, sneezes or talks; these droplets can land in the mouths or noses of people who are nearby or possibly be inhaled into the lungs; and some recent studies have suggested that COVID-19 may be spread by people who are not showing symptoms. *See* https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html.

53.     The CDC has noted that it may be possible that a person can get COVID-19 by touching a surface or object that has the virus on it and then touching their own mouth, nose, or possibly their eyes but that this is not thought to be the main way the virus spreads, but we [the CDC] are still learning more about how this virus spreads.

54.     The CDC has said that the best way to prevent illness is to avoid being exposed to this virus and that steps can be taken to slow its spread: Maintain good social distance (about 6 feet). This is very important in preventing the spread of COVID-19; Wash your hands often with soap and water. If soap and water are not available, use a hand sanitizer that contains at least 60% alcohol; Routinely clean and disinfect frequently touched surfaces; and Cover your mouth and nose with a cloth face covering when around others.

55.     The CDC has noted that the primary and most important mode of transmission for COVID-19 is through close contact from person-to-person. Based on data from lab studies on COVID-19 and what we [the CDC] know about similar respiratory diseases, it may be possible that a person can get COVID-19 by touching a surface or object that has the virus on it and then touching their own mouth, nose, or possibly their eyes, but this isn't thought to be the main way

the virus spreads. https://www.cdc.gov/media/releases/2020/s0522-cdc-updates-covid-transmission.html (last edited May 23, 2020).

56.     Compliance with the CDC recommendations, along with compliance with the Civil Authority Orders of New York and local counties (see below), effectively made it impossible for Plaintiff to operate its dental practice in the usual and customary manner causing the practice to suffer business losses and added expenses as provided for and covered under the Policy.

57.     China, Italy, France, and Spain have implemented the cleaning and fumigating of public areas prior to allowing them to re-open publicly due to the intrusion of microbials.

58.     A French Court has determined that business interruption coverage applies to the COVID-19 Pandemic. *See*

https://www.insurancejournal.com/news/international/2020/05/22/569710.htm.

59.     The determination by a Court of another country that coverage exists is consistent with public policy that in the presence of a worldwide Pandemic, such as COVID-19, businesses that possess business interruption insurance coverage should recover their losses from the insurance carriers.

## C.  Civil Authority

60.     The Governor of New York, Andrew Cuomo, ordered a State of Emergency and a stay at home order on March 7, 2020. *See* Executive Order 202, attached herein as Exhibit 2.

61.     On April 29, 2020, Governor Cuomo issued an order allowing general hospitals to resume elective surgeries and procedures so long as specific criteria are met within the county. Dental offices not within hospital facilities were unable to fit the criteria. *See* New York Emergency Executive Order No. 202.25, attached herein as Exhibit 3.

62.     On June 1, 2020, Governor Cuomo loosened restrictions, allowing New York dentists to reopen. Dentists' offices will be subject to state guidance on best practices for safety

and    social    distancing    to    avoid    spreading    the    coronavirus.    *See*
https://www.governor.ny.gov/news/governor-cuomo-announces-dentists-can-reopen-statewide-tomorrow-and-updates-new-yorkers-states (last visited July 27, 2020).

63.    Plaintiff's businesses have been unable to operate due to the stay-at-home orders for public safety issued by Governor Cuomo and the State of New York generally.

64.    The Civil Authority Orders in and around Plaintiff's place of businesses also explicitly acknowledge that COVID-19 causes direct physical damage and loss to property. The City of New York Order explicitly stated that COVID-19 "is causing property loss and damage[.]" https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-101.pdf. Similarly, Civil Authority Orders entered in other states confirm this as well. For example, the Pennsylvania Supreme Court recently clarified Governor Wolf's Civil Authority Orders and supported Plaintiff's position that physical loss and damage exists, resulting in coverage here. *See Friends of DeVito*, *et. al v. Wolf*, No. 68 MM 2020 (Pa. April 13, 2020).

65.    Further, on April 10, 2020, President Trump, expressing the expectations of the average policyholder, supported insurance coverage for business loss like that suffered by the Plaintiff:

> REPORTER: Mr. President may I ask you about credit and debt as well. Many American individuals, families, have had to tap their credit cards during this period of time. And businesses have had to draw down their credit lines. Are you concerned Mr. President that that may hobble the U.S. economy, all of that debt number one? And number two, would you suggest to credit card companies to reduce their fees during this time?
>
> PRESIDENT TRUMP: Well it's something that we've already suggested, we're talking to them. ***Business interruption insurance***, I'd like to see these insurance companies—you know you have people that have paid. When I was in private I had business interruption. When my business was interrupted through a hurricane or whatever it may be, I'd have business where I had it, I didn't always have it, sometimes I had it, sometimes, I had a lot of different

companies. ***But if I had it I'd expect to be paid***. You have people. I speak mostly to the restaurateurs, where they have a restaurant, they've been paying for 25, 30, 35 years, business interruption. They've never needed it. All of a sudden they need it. And I'm very good at reading language. I did very well in these subjects, OK. And I don't see the word pandemic mentioned. Now in some cases it is, it's an exclusion. But in a lot of cases I don't see it. I don't see it referenced. And they don't want to pay up. I would like to see the insurance companies pay if they need to pay, if it's fair. And they know what's fair, and I know what's fair, I can tell you very quickly. But business interruption insurance, that's getting a lot money to a lot of people. And they've been paying for years, sometimes they just started paying, but you have people that have never asked for business interruption insurance, and they've been paying a lot of money for a lot of years for the privilege of having it, and then when they finally need it, the insurance company says 'we're not going to give it.' We can't let that happen.

https://youtu.be/_cMeG5C9TjU (last visited on April 17, 2020) (emphasis added).

66.    The President is articulating a few core points:

   a.   Business interruption is a common type of insurance. It applies to a variety of business establishments.

   b.   Businesses pay in premiums for this coverage and should reasonably expect they'll receive the benefit of the coverage.

   c.   This pandemic should be covered unless there is a specific exclusion for pandemics.

   d.   If insurers deny coverage, they would be acting in bad faith.

   e.   Public policy considerations support a finding that coverage exists and that a denial of coverage would be in violation of public policy.

67.    These Civil Authority Orders and proclamations, as they relate to the closure of all "non-life- sustaining businesses," evidence an awareness on the part of both state and local governments that COVID-19 causes damage to property. This is particularly true in places where business is conducted, such as Plaintiff's, as the requisite contact and interaction causes a heightened risk of the property becoming contaminated and required constant sanitation and cleaning to avoid spread of COVID-19.

68.     Plaintiff did not have the ability or right to ignore these Civil Authority Orders and proclamations as doing so would expose Plaintiff to fines and sanctions. As a result of complying with the orders and proclamations, the dental practice was closed to all but emergency appointments.

69.     With the absence of non-emergency appointments – a significant amount of Plaintiff's business lost significant revenue that patients would have provided if the pandemic had not occurred. Most of Plaintiff's revenues are from preventative care as opposed to emergency care. Plaintiff only performed emergency care once a week or every other week.

70.     Plaintiff's adherence to the requirements of these Civil Authority Orders and proclamations was in furtherance of the protecting the public, the public's good, supportive of public policy to attempt to minimize the risk of spread of COVID-19 and consistent with it complying with the Civil Authority Orders entered.

### D.  Impact to Plaintiff

71.     As a result of the Orders referenced herein, access to Plaintiff's Insured Property was significantly impacted causing the suspension of non-emergency dental care and suspension of or reduction of business operations.

72.     As a consequence of the Orders, the events described above, the lack of an ability to provide non-emergency dental care and the dangers and physical omnipresence of the Coronavirus in the Insured Property and the surrounding areas of the Insured Property, Plaintiff lost business in treating patients as a result of the Orders. Plaintiff's office was only open on certain days for the limited purpose of performing emergency care.

73.     Prior to the above dates Plaintiff's dental practice was fully open. Plaintiff's practice is not a closed environment, people – staff, patients, and others – constantly cycle in and out of the Property. Accordingly, there is an ever-present risk that the Insured Property is

contaminated and would continue to be contaminated and open access presented an ever-present risk that people entering the Insured Property could be exposed to COVID-19 and become ill from such exposure. To eradicate any Coronavirus that was present in the facility, Plaintiff regularly cleaned and sanitized the dental office. Enhanced cleaning and sanitation protocols went into place in March. Since that date and continuing to the present and expected to continue into the foreseeable future, Plaintiff has been following CDC and American Dental Association guidelines for cleaning and sanitation, which continues to this day. Also, Plaintiff mandates that within the dental office, the wearing of facial coverings/masks is required until the patient is ready to be treated, regardless of local or state mandates, in an effort to minimize the threat of spread of the Coronavirus within the Insured Property. Plaintiff was required to prioritize the most critical dental services and provide care in a way that minimizes harm to patients from delaying care and harm to personnel from potential exposure to COVID-19. Therefore, the novel coronavirus has caused "direct physical loss of or damage to" Plaintiff's Insured Property under the Policy.

74.    Plaintiff's business is highly susceptible to rapid person-to-property transmission of the virus, and vice-versa, because the activities of the patients and the staff require them to work in close proximity to one another within the property and to come in contact with personal property within the building premises that could contain the COVID-19 novel coronavirus.

75.    The virus is physically impacting the Insured Property. Plaintiff's property is contaminated by COVID-19. Plaintiff's intense cleaning and sanitation protocols is an attempt to remedy the physical damage to the Insured Property. Plaintiff's Insured Property is still impacted by COVID-19 and is damaged by it. Any effort by Defendant to deny the reality that the virus causes physical loss and damage would constitute a false and potentially fraudulent misrepresentation that could endanger Plaintiff and the public.

16

76.     Plaintiff's dental practice, including the Insured Property, is highly susceptible to contamination and damage, from, among other things, the rapid person-to-person and person-to-property contamination as COVID-19 is carried into the Insured Property from the surrounding area and other contaminated and damaged premises.

77.     Because of the nature of COVID-19 as described above, relating to its persistence in locations and the prospect of causing asymptomatic responses in some people, the risk of infection to persons is not only high, but could cause persons with asymptomatic responses to then come into contact with others who would not be so fortunate as to suffer merely an asymptomatic response, and instead suffer serious illness.

78.     The Civil Authority Orders entered by the state and local government were in the exercise of authority to protect the public and minimize the risk of spread of disease.

79.     Even with the entry of these Civil Authority Orders there remained physical impact not only in and within Plaintiff's business property but in and around the surrounding location of Plaintiff's business property in light of COVID-19 presence not being detectable other than through microscopic means, and occurrence of illness.

80.     The entry of the Civil Authority Orders to mitigate health risks to the public by attempting to prevent COVID-19 contamination, through the closing businesses and ordering persons to stay at home resulted in a physical impact on Plaintiff's business and Insured Property.

81.     Plaintiff specifically sought coverage for business interruption losses and extended expenses and paid premiums for such coverage and with an expectation that the Policy Plaintiff purchased provided such coverage, with no disclosures to the contrary being made to Plaintiff by Defendant or its agents.

82.     Plaintiff had no choice but to comply with the Civil Authority Orders, for failure to do so would have exposed Plaintiff and its dental practice to fines and sanctions. Plaintiff's compliance with mandates resulted in Plaintiff suffering business losses, business interruption and extended expenses of the nature that the Policy covers and for which Plaintiff's reasonable expectation was that coverage existed in exchange for the premiums paid. As a result of these Orders, Plaintiff has incurred, and continues to incur, among other things, a substantial loss of business income and additional expenses covered under the Policy.

83.     A declaratory judgment is necessary to be entered that determines that coverage exists under the Policy for the events and circumstances described herein. The entry of a declaratory judgment will prevent Plaintiff from being left without vital insurance coverage that was paid for through premiums to ensure the survival of the dental practice which was significantly impacted due to the omnipresence of the Coronavirus, including Plaintiff's dental practice and the surrounding areas, and because of the described shutdowns involving non-emergency procedures, the dental office and the impact that the civil authorities' response had on the communities where the dental office is located.

## V.     CAUSE OF ACTION
## DECLARATORY RELIEF

84.     Plaintiff re-alleges and incorporates by reference into this cause of action each and every allegation set forth in each and every paragraph of this Complaint.

85.     An actual controversy has arisen, pursuant to 28 U.S.C. § 2201, between Plaintiff and Defendant as to the rights, duties, responsibilities and obligations of the parties under the Policy in that Plaintiff contends and, on information and belief, that Defendant disputes and denies, *inter alia*, that:

> a.  The Civil Authority Orders constitute a prohibition of access to Plaintiff's Insured Property;

18

b.  The prohibition of access by the Civil Authority Orders has specifically prohibited access as defined in the Policy;

c.  The Civil Authority Orders trigger coverage;

d.  The Policy provides coverage to Plaintiff for any current and future closures in New York due to physical loss or damage directly or indirectly from the Coronavirus and/or pandemic circumstance under the Civil Authority coverage parameters;

e.  The Policy's exclusions for virus and bacteria do not apply to the circumstances presented in the lawsuit and the kind and types of damages and losses suffered by Plaintiff;

f.  Defendant's denial of coverage for losses sustained that were caused by the entry of the Civil Authority Orders referenced, and Plaintiff's adherence to the Civil Authority Orders violates public policy;

g.  That under the circumstances of this Pandemic and the entry of the Civil Authority Orders referenced, Plaintiff had no choice but to comply with the Civil Authority Orders, and that Plaintiff's compliance resulted in Plaintiff suffering business losses, business interruption and extended expenses which is therefore a covered expense;

h.  That the Policy provides business income coverage in the event that Coronavirus has directly or indirectly caused a loss or damage at the insured premises or immediate area of the Insured Property; and

i.  Resolution of the duties, responsibilities and obligation of the parties is necessary as no adequate remedy at law exists and a declaration of the Court is needed to resolve the dispute and controversy.

86.  Plaintiff seeks a Declaratory Judgment to determine whether the Civil Authority Orders constitute a prohibition of access to Plaintiff's Insured Property.

87.  Plaintiff further seeks a Declaratory Judgment to affirm that the Civil Authority Orders trigger coverage.

88.  Plaintiff further seeks a Declaratory Judgment to affirm that the Policy provides coverage to Plaintiff for any current and future closures of businesses such as Plaintiff's in New York due to physical loss or damage from the Coronavirus and/or the pandemic and the Policy

provides business income coverage in the event that Coronavirus has caused a loss or damage at the Insured Property.

89.     Plaintiff further seeks a Declaratory Judgment to affirm that any reliance on the Virus Exclusion clause is estopped by the principles of regulatory estoppel.

90.     Plaintiff does not seek any determination of whether the Coronavirus is physically in or at the Insured Property, a specific amount of damages, or any other remedy other than declaratory relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff herein prays as follows:

    a.  For a declaration that the Civil Authority Orders constitute a prohibition of access to Plaintiff's Insured Property.

    b.  For a declaration that the prohibition of access by the Civil Authority Orders specifically prohibited access as defined in the Policy.

    c.  For a declaration that the Civil Authority Orders trigger coverage under the Policy.

    d.  For a declaration that the Policy provides coverage to Plaintiff for any current and future closures in New York due to physical loss or damage directly or indirectly from the Coronavirus and/or pandemic circumstance under the Civil Authority coverage parameters.

    e.  For a declaration that the Policy's exclusions for virus and bacteria do not apply to the circumstances presented in the lawsuit and the kind and types of damages and losses suffered by Plaintiff.

    f.  For a declaration that Defendant's denial of coverage for losses sustained that were caused by the entry of the Civil Authority Orders referenced, and Plaintiff's adherence to the Civil Authority Orders, violates public policy.

    g.  For a declaration that under the circumstances of this Pandemic and the entry of the Civil Authority Orders referenced, Plaintiff had no choice but to comply with the Civil Authority Orders, and that Plaintiff's compliance resulted in Plaintiff suffering business losses, business interruption and extended expenses which is therefore a covered expense.

h.   For a declaration that the Policy provides coverage to Plaintiff for any current, future and continued closures of non-essential businesses due to physical loss or damage directly or indirectly from the Coronavirus.

i.   For a declaration that the Policy provides business income coverage in the event that Coronavirus has directly or indirectly caused a loss or damage at the Plaintiff's Insured Property or the immediate area of the Plaintiff's Insured Property.

j.   For such other relief as the Court may deem proper.

**<u>TRIAL BY JURY IS DEMANDED</u>**

Plaintiff hereby demands trial by jury.

Dated: July 28, 2020                                  Respectfully submitted,

*/s/ Michael W. Weinkowitz*
Arnold Levin, Esq.
Laurence S. Berman, Esq.
Frederick Longer, Esq.
Daniel Levin, Esq.
Michael Weinkowitz. Esq.
**LEVIN SEDRAN & BERMAN, L.L.P.**
510 Walnut Street, Suite 500
Philadelphia, PA 19106-3697
Telephone: (215) 592-1500
alevin@lfsblaw.com
lberman@lfsblaw.com
flonger@lfsblaw.com
dlevin@lfsblaw.com
mweinkowitz@lfsblaw.com

Richard M. Golomb, Esq.
Kenneth J. Grunfeld, Esq.
**GOLOMB & HONIK, P.C.**
1835 Market Street, Suite 2900
Philadelphia, PA 19103
Telephone: (215) 985-9177
Facsimile: (215) 985-4169
rgolomb@golombhonik.com
kgrunfeld@golombhonik.com

W. Daniel "Dee" Miles, III, Esq.
Rachel N. Boyd, Esq.

21

Paul W. Evans, Esq.
**BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.**
P.O. Box 4160
Montgomery, Alabama 36103
Telephone: (334) 269-2343
Facsimile: (334) 954-7555

*Counsel for Plaintiff*